NOT FOR PUBLICATION

FILED & ENTERED

AUG 20 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Bever       DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>PETER BROWN KLEIDMAN,<br><br>              Reorganized Debtor. | Case No.: 1:12-bk-11243-MB<br><br>Chapter 11<br><br>Adv. Proc. No.: 1:17-ap-01007-MB |
| PETER KLEIDMAN<br><br>              Plaintiff,<br><br>              vs.<br><br>HILTON & HYLAND; JOSHUA ALTMAN;<br>MATTHEW ALTMAN, DOES 1 – 100.<br><br>              Defendants. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS HILTON & HYLAND, JOSHUA ALTMAN AND MATTHEW ALTMAN [ADV. DKT. 248]** |

Defendants Hilton & Hyland Real Estate, Inc., Joshua Altman and Matthew Altman (collectively, the "Defendants") filed their Motion for Summary Judgment (the "Motion") and Statement of Uncontroverted Facts and Conclusions of Law supported by the declarations of Joshua Altman, Matthew Altman, Dustin Cumming, Danelle Lavin, Bruce Makowksy, Aviv L. Tuchman, expert witness Allan Wallace, Branden Williams, Rayni Williams, William G. Willson, and a request for judicial notice. Adv. Dkt. 248 – 262. Peter Kleidman, the reorganized debtor and plaintiff in the above-captioned adversary proceeding ("Kleidman") opposes the Motion based on

1   his Opposition and Statement of Genuine Issues, supported by his own declaration, the declaration

2   of Dan Rinsch and a request for judicial notice.  Adv. Dkt. 348 – 350.  The Defendants' reply

3   papers are supported by the supplemental declaration of Aviv Tuchman.  Adv. Dkt. 354. The

4   Motion came on for hearing on May 9, 2019.  Appearances were as noted in the record.  Having

5   considered the parties' papers filed in support of and in opposition to the Motion for Summary

6   Judgment, oral arguments, as well as other pleadings and papers on file in this Adversary

7   Proceeding and the main bankruptcy case, the Court now finds and concludes as follows:

8                                   **<u>UNCONTROVERTED FACTS</u>**

9           1.      Kleidman is a sophisticated and experienced businessman.  He graduated from

10  Cambridge University with a Ph.D. in mathematics and thereafter worked for several years in New

11  York City and London at Goldman Sachs, Bankers Trust, Dresdner Bank AG, ABN AMRO Bank

12  and HSBC Bank, principally as a financial analyst.  Declaration of Aviv L. Tuchman ("Tuchman

13  Decl."), ¶ 19, Exh. P [Deposition of Peter Kleidman ("Kleidman Depo."], Adv. Dkt. 250-3 at 11-

14  21.[1]

15          2.      At some point in time, Kleidman began purchasing real properties in Southern

16  California, including at least six properties, several of which he eventually "flipped" for a profit.

17  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv. Dkt. 250-3 at 22-23, 27-29, 33-36.  Among

18  the properties he purchased were 21942 Pacific Coast Highway, Malibu, California, which he

19  purchased for $2.9 million and sold for approximately $13.4 million, and 22420 Pacific Coast

20  Highway, Malibu, California, which he purchased for $15.5 million and sold for approximately

21  $18.9 million.  *Id*. Adv. Dkt. 250-3 at 70-73, 78.

22          3.      In 2006, Kleidman sold the 21942 Pacific Coast Highway property for $13.4

23  million, and used the net sales proceeds to purchase two properties, including 9380 Sierra Mar

24  Drive, Los Angeles, California, 90069 (the "Property"), the property at issue in this Adversary

25  Proceeding.  *Id.* Adv. Dkt. 250-3 at 22, 30, 78.

26

27  _____

28  [1]  All page citations refer to the ECF legend pagination.

4.     In or about May, 2010, Kleidman received an appraisal for the Property which valued it at $4.25 million, and was informed by the appraiser that the Property would need significant updating as it was "ugly and undesirable."  Tuchman Decl., ¶ 16, Exh. M [Plaintiff's Amended Responses to Hilton & Hyland's RFAs, Set Two], Adv. Dkt. 250-2 at 56; Tuchman Decl., ¶ 19, Exh. P, Adv. Dkt. 250-3 at 97, 99, 177-183.

5.     In 2011, Kleidman entered into a listing agreement with real estate broker Sun Heritage Real Estate, which listed the 9380 Sierra Mar Property on the MLS with a listing price of $4.2 million.  *Id.* Adv. Dkt. 250-3 at 100, 184-194.

6.     In or about February, 2012, Kleidman received an appraisal for the Property which valued it at $3.8 million and which stated that the "[i]nterior finish does not match the quality of the basic construction. . . . The interior walls are faux painted in dark, cave like colors. . . Most buyers of this home will look to remodel most of the interior with a new kitchen, bathrooms, flooring and HVAC. . . There is functional obsolescence not only associated with the pool and spa but with the interior improvements."  Declaration of William G. Willson, ¶ 3 and Exh. A [February 4, 2012 Appraisal] thereto, Adv. Dkt. 259 at 11.  Kleidman knew in 2012 that it would be worth significantly more if it were renovated, but Kleidman was unable to renovate the Property at that time.  Tuchman Decl., ¶ 14, Exh. K [Plaintiff's Amended Responses to Hilton & Hyland's RFAs, Set One], Adv. Dkt. 250-2 at 29; Tuchman Decl., ¶ 19, Exh. P, Adv. Dkt. 250-3 at 108-109 ("Q: And you also understood, because you received this appraisal and you knew independently that that house, 9380 Sierra Mar, is potentially – can be worth significantly more if it's renovated, right? A: Right.  Q:  Okay.  Did you renovate it?  A:  No.  Q:  Could you renovate it in February of 2012?  A: No.").

7.     In 2012, Sun Heritage Real Estate relisted the Property on the MLS for $3.9 million. While listed at that price, Kleidman received purchase offers, however, Wells Fargo Bank would not accept any of the offers that were received.  Tuchman Decl., ¶ 14, Exh. K, Adv. Dkt. 250-2 at 27-29.

8.     Having lost money in the stock market and in other non-real estate investments, Kleidman was not able to maintain the mortgages on all of his investment real properties.

2

1  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv. Dkt. 250-3 at 68-69.  As a result, Kleidman

2  commenced this bankruptcy case on February 8, 2012.  Case Dkt. 1.

3        9.     Kleidman listed the value of the Property at $3.8 million on his Schedule A.  Case

4  Dkt. 1 at 20.  Thereafter, Wells Fargo Bank filed a proof of claim for $512,937, secured by the

5  Property, which Wells Fargo Bank stated was worth $4.2 million.  POC #5.  On or about October

6  18, 2012, Kleidman amended his Schedule A and listed the value of the Property as $4.2 million.

7  Case Dkt. 65 at 3.

8        10.    Postpetition, Kleidman contacted multiple real estate agents about selling the

9  Property, including Michael Eisenberg, Benjamin Bacal of Rodeo Realty, Inc., and Lee Wasser of

10  Sotheby's International Realty. Like the agents at Sun Heritage Real Estate before them, all of

11  them told Kleidman that the Property could not be sold for more than the total liens and

12  recommended a short sale.  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv. Dkt. 250-3 at 53,

13  69-71, 112-116, 126; Declaration of Dustin Cumming ("Cumming Decl."), ¶ 6; Declaration of

14  Danelle Lavin ("Lavin Decl."), ¶ 6.

15        11.    In November 2012, Benjamin Bacal brought Bruce Makowsky ("Makowsky") to

16  Kleidman as a prospective buyer of the Property.  Kleidman knew that Makowsky wanted to buy

17  the Property to flip it.  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv. Dkt. 250-3 at 113-115

18  ("A: [Bacal] actually brought me Makowsky in November of '12.  Q:  And you knew Makowsky

19  was going to buy it to flip it?  A:  Yeah."); Declaration of Bruce Makowsky ("Makowsky Decl."),

20  ¶¶ 4, 6.

21        12.    Although multiple agents told him a short sale was his only option,  Dustin

22  Cumming, Aaron Kirman, and Danelle Lavin (formerly, Danelle Vance) at Defendant Hilton &

23  Hyland, told Kleidman that they believed that the Property could be sold for more than the total

24  liens and without a short sale. For that reason, he selected Mr. Kirman, Mr. Cumming, and Ms.

25  Lavin (collectively, the "Listing Agents") at Hilton & Hyland to sell the Property Tuchman Decl., ¶

26  19, Exh. P [Kleidman Depo.], Adv.  Dkt. 250-3 at 72-73, 103, 136; Cumming Decl., ¶ 6; Lavin

27  Decl., ¶ 6.

28

13.     On or about December 1, 2012, Kleidman and Defendant Hilton & Hyland entered into a Residential Listing Agreement ("RLA") to list the Property for $5,495,000.  Case Dkt. 99 at 5-6, 8, 24-32.

      a.   The RLA, at Paragraph 8, entitled "Broker's And Seller's Duties," provided that: "Seller is responsible for determining at what price to list and sell the Property." The RLA did not expressly require Defendant Hilton & Hyland to determine the value of the Property at the time it was listed.

      b.   The RLA, at Paragraph 10.C, entitled "Possible Dual Agency With Buyer," provided that in the event of a dual agency, "Seller understands and agrees that: . . . Broker, without the prior written consent of Buyer, will not disclose to Seller that Buyer is willing to pay a price greater than the offered price."

      c.   The RLA, at Paragraph 10.D, further provided that: "Seller consents to Broker's representation of sellers and buyers of other properties before, during and after the end of this Agreement."

      d.   The RLA did not expressly require Defendant Hilton & Hyland to investigate what a fully renovated version of the Property would be worth.

14.     In support of their Motion, the Defendants offer the declaration of their expert witness, Alan D. Wallace, regarding the applicable standard of care for real estate brokers under the facts of this case.  Case Dkt. 354.  Kleidman does not offer any expert testimony to rebut or otherwise respond to the Wallace Declaration or the opinions expressed therein.

15.     The custom and practice in the industry is that the seller determines the price and that a real estate agent or broker, in the absence of a specific agreement to do so, does not owe a duty to provide an opinion or make any determination as to a property's value or to opine or determine the value of a "fully renovated version" of the property.  Expert Witness Declaration of Allan Wallace ("Wallace Decl."), ¶ 7(a).

16.     On or about January 24, 2013, Kleidman filed in his bankruptcy case his *Application to Employ Hilton & Hyland, Aaron Kirman, Dustin Cumming as Real Estate Broker / Agents to Sell Estate Real Property* (the "Employment Application").  Case Dkt. 99.  The only listing agents

identified in the Employment Application were Aaron Kirman, Dustin Cumming and Danelle

Vance.  Defendants Joshua Altman and Matthew Altman were not identified as listing agents.

Following a hearing on shortened notice, the Court approved the Employment Application on

January 30, 2013.  Case Dkt. 114.

17.   Cumming provided Kleidman with comparable properties to review and asked him

to decide on a listing price.  Eventually, Kleidman told Cumming that he wanted to list the Property

for $5,495,000, which was a figure Kleidman said he arrived at after consulting with his

bankruptcy counsel and based on his own research.  Cumming Decl., ¶ 7; Tuchman Decl., ¶ 19,

Exh. P [Kleidman Depo.], Adv.  Dkt. 250-3 at 103-04.

18.   Kleidman never asked Cumming or Lavin to opine on the value of the Property, or

to determine the value of the Property, and neither of them formed an opinion as to its value.

Neither of them believed that it was worth more than $5.3 million.  Nor did they form an opinion as

to what the value of a fully renovated version of the Property would be.  Cumming Decl, ¶ 11;

Lavin Decl., ¶ 9.

19.   At the time that Kleidman determined the listing price for the Property, and at the

time he entered into the RLA, Kleidman:

a. Believed that the Property was "gothic," "very, very strange," "ugly," and

"undesirable."  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv.  Dkt. 250-

3 at 59, 99, 108, 146-49 & Exh. 39 ["Before" Photographs of Property] to the

Kleidman Depo., Adv. Dkt. 250-4 at 9-21;

b. Believed that a fully renovated version of the Property might have a fair market

value as high as $8.0 - $9.0 million.  Tuchman Decl., ¶ 16, Exh. M, Adv. Dkt.

250-2 at 58;

c. Had been apprised by William Willson, a certified real estate appraiser, that the

Property had "the potential to be a home worth significantly more if the interior

is renovated with quality to match the construction."  Tuchman Decl., ¶ 19, Exh.

P [Kleidman Depo.], Adv.  Dkt. 250-3 at 108-09; Willson Decl., Exh. A;

d.  Did not have any money to develop the Property.  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv. Dkt. 250-3 at 56-57, 109;

e.  Knew there were different pools of buyers for the Property.  *Id.* at 150 ("A: But there can be different pools of buyers.  Q:  But you knew that at the time.  A: Right.  Q: Okay.  You knew at that time that there were different kinds of buyers out there, correct?  A: Yes.");

f.  Knew that, generally, if a property is renovated it can sell for more money and believed that if Makowsky bought the Property he would probably spend "several million" dollars to renovate it.  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv.  Dkt. 250-3 at 64-65, 152.

20.  Defendant Hilton & Hyland placed advertisements for the Property in The Los Angeles Times, The MLS Broker Caravan, and Christie's International Real Estate syndicates. After listing it on the MLS, the Listing Agents held "open houses" and showed the Property eighteen times, including to developers and flippers. The Listing Agents kept Kleidman informed of the showings and buyer interest, including from developers and flippers. Kleidman provided Lavin the survey and floor plans for the Property to be given to interested developers and flippers. Cumming Decl., ¶ 8; Lavin Decl., ¶ 7; Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv.  Dkt. 250-3 at 46-47, 90, 118-120, 237-240; Case Dkt. 100 [*Debtor's Motion for Order 1) Authorizing Sale of Real Property, etc.*], Declaration of Peter Kleidman at ¶ 5.

21.  Defendant Hilton & Hyland and the Listing Agents did everything that Kleidman asked them to do during the listing and sale of the Property.  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv.  Dkt. 250-3 at 91.

22.  After the Property was listed on the MLS, Kleidman determined that a sale price of $5,300,000 would cover all of the liens plus commissions and closing costs and would leave him with a small amount of net proceeds.  Kleidman received multiple offers for less than the listing price.  Based on his own calculations, Kleidman countered the offers with a $5,299,999 purchase price. Tuchman Decl., ¶ 14, Exh. K, Adv. Dkt. 250-3 at 35:22-25; Exh. P [Kleidman Depo.], Adv.

1  Dkt. 250-3 at 121-22 and Exh. 29 [January 16, 2013 email chain] to the Kleidman Depo., Adv.

2  Dkt.250-3 at 241-43; Cumming Decl., ¶ 8; Lavin Decl., ¶ 7.

3     23. Defendant Joshua Altman and Defendant Matthew Altman (collectively, the

4  "Altman Defendants") did not represent Kleidman in marketing and selling the Property.  They

5  were not his listing agents, they were not parties to the RLA, nor did Kleidman contact them or

6  consult with them before he determined the listing price or entered into the RLA with Defendant

7  Hilton & Hyland.  Tuchman Decl., ¶ 17, Exh. N [Plaintiff's Amended Responses to Matthew

8  Altman's  Requests for Admissions, Set One] and Exh. O [Plaintiff's Amended Responses to

9  Joshua Altman's  Requests for Admissions, Set One], Adv. Dkt. 250-2 at 64-65, 73-74; Declaration

10  of Joshua Altman ("J. Altman Decl."), ¶ 5; Declaration of Matthew Altman ("M. Altman"), ¶ 5.

11     24. During the sale of the Property, Kleidman did not speak with the Altman Defendants

12  and had not heard of them until after the sale closed.  Tuchman Decl., ¶ 19, Exh. P [Kleidman

13  Depo.], Adv.  Dkt. 250-3 at 268 ("Q: Okay.  Did you ever pick up the phone and call either of the

14  Altmans during this transaction? A: No.  Q:  Had you ever heard of them?  A: No.  Q:  Okay.  So

15  the first time you heard of the Altmans was after the sale closed, right?  A: Right").

16     25. Before filing this action, Kleidman never spoke with either of the Altman

17  Defendants.  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv.  Dkt. 250-3 at 40 ("Q: Did you

18  ever in your life speak with Josh Altman?  A: No.  Q: Did you ever in your life speak with Matt

19  Altman?  A: No").

20     26. Once he saw the Property listing on the MLS, Joshua Altman sent it to potential

21  buyers he thought would be interested, including Bruce Makowsky. He also reached out to Lavin to

22  obtain more information about the listing. She informed him that the seller was in bankruptcy, he

23  owed about $4.9 million in liens, that any sale would be subject to the bankruptcy court's approval,

24  and that they had multiple showings a day to developers and flippers.  Tuchman Decl., ¶ 19, Exh. P

25  [Kleidman Depo.], Adv.  Dkt. 250-3 at 64; J. Altman Decl., ¶ 7 and Exh. 1 [January 18, 2013

26  email] thereto; Lavin Decl., ¶ 8.

27     27. Makowsky wanted to offer $5,000,000, which is the price he had decided on when

28  he first saw the Property back in November 2012. On behalf of Makowsky, Joshua Altman

submitted an all cash $5,000,000 purchase offer dated January 20, 2013 (the "Offer") to the Listing Agents, which disclosed that Hilton & Hyland was the buyer's broker.  Case Dkt. 100, Declaration of Peter Kleidman at ¶ 7; J.Altman Decl., ¶¶ 7-8 and Exh. 1 thereto; Makowsky Decl. at ¶¶ 7-8.

28.    The Listing Agents told Kleidman about the Makowsky offer for the Property and, because Kleidman knew Makowsky wanted to flip the Property, Kleidman emailed plans and surveys to Lavin to share with Makowsky.  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv. Dkt. 250-3 at 64-65 ("Q:  Do you remember sending any plans to Danelle?  A:  Yes, I believe I did send her some.  Q:  Okay.  Because you knew Makowsky wanted to flip the property.  A:  Right.  Q:  Okay.  And you knew Makowsky was going to have to build and work hard to renovate that gothic property.  A:  Right"), 145 ("Q: Then the buyer renovated the property for the purpose of flipping it, right?  A:  Right.  A: And you know he was going to flip it, right?  A: I believed it.  I didn't have firsthand knowledge.  Q:  Okay.  You believed it based on all the circumstance surrounding the transaction and your knowledge of him, correct?  A:  Right.  Q: Makowsky, right?  A:  Right."), 239-240.

29.    Kleidman signed the Offer on January 21, 2013 and made counter offer number 1 for $5,299,000.  Kleidman price because he believed that the Property was worth around that amount and he was trying to get a price at which lienholders would be paid with something leftover for his bankruptcy estate.  Nobody at Hilton & Hyland pushed him to offer that price.  Case Dkt. 100, Declaration of Peter Kleidman, ¶ 7; Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv. Dkt. 250-3 at 135, 137; J. Altman Decl., ¶ 9; Makowsky Decl., ¶ 8.

30.    Kleidman and Makowsky exchanged counter offers number 2 and 3.  Then Makowsky decided to offer $5,300,000 with no contingencies and as fast an escrow as possible and he sent counter offer number 4 dated January 23, 2013 with those terms and contingency removal number. 1, which Kleidman accepted.  Case Dkt. 100, Declaration of Peter Kleidman, ¶¶ 7-9; J. Altman Decl., ¶¶ 10-11; Makowsky Decl., ¶ 8.

31.    Defendant Hilton & Hyland provided Kleidman a Market Conditions Advisory ("MCA"), which he signed on or about January 24, 2013.  The MCA provided, at Paragraph 3, under "Seller Considerations," as follows:

> As a Seller, you are responsible for determining the asking price for
> your property. . . . All Sellers should be sure they are comfortable
> with the asking price they are setting and the price they are accepting.
> There is not, and cannot be, any guarantee that the price you decide
> to ask for your property, or the price at which you agree to sell your
> property is the highest available price obtainable for the property. It
> is solely your decision as to how much to ask for your property and at
> which price to sell your property.

32.    Kleidman read and understood paragraph 3.  Tuchman Decl., ¶ 19, Exh. P
[Kleidman Depo.], Adv.  Dkt. 250-3 at 130-31, Adv. Dkt. 250-4 at 6-7.

33.    Kleidman received several purchase offers for the Property, which were all put
through a countering process to get the best offer. Other than Makowsky's offer, the offers capped
out at $4,600,000 or less.  Case Dkt. 100, Declaration of Peter Kleidman, ¶¶ 5-6, Declaration of
Dustin Cumming, ¶ 5; Cumming Decl., ¶¶ 8-9.

34.    On January 25, 2013, Kleidman filed his *Motion for Order: (1) Authorizing Sale of
Real Property Free and Clear of Liens, Encumbrances and Interests, etc.* (the "Sale Motion") by
which he sought authority to sell the Property for $5.3 million to Makowsky.  Case Dkt. 100.  In
support of the Sale Motion, Kleidman testified that:

    a.  Defendant Hilton & Hyland "put together a comprehensive marketing plan that
resulted in the Property being shown 18 times with three offers received where
we engaged in the countering process to get the best offer." *Id.* at 13, ¶ 5;

    b.  All but the Makowsky offers "capped out at $4.6 million which did not cover all
the secured obligations.  The current offer is the highest price, the cleanest and
strongest offer and will clearly benefit the estate.  It is an all cash offer with no
contingencies . . . "*Id.* at 13-14, ¶¶ 6, 7;

    c.  He supported the sale after having "explored many options and realize that a sale
at a price that covers my obligations is in both my best interest and the best
interest of my bankruptcy estate and creditors.  This is the best opportunity for

9

everyone in my case.  Thus it is my business judgment that the proffered sale is

in the bests interests of the estate" and believed that the purchase price was

"over market." *Id.*, at 15, ¶ 12.

35.    Following a January 30, 2013, hearing on shortened notice, the Court approved the

sale of the Property to Makowsky pursuant to its sale order entered on January 31, 2013.  Case Dkt.

117.

36.    Sale of the Property closed on February 1, 2013.  The estate received $122,644 in

net proceeds from the sale.  Tuchman Decl., ¶ 19, Exh. P [Kleidman Depo.], Adv.  Dkt. 250-3 at

142-143 and Exh. 36 [Seller's Final Closing Statement] to the Kleidman Depo., Adv. Dkt. 250-4 at

8.

37.    Neither Cumming nor Lavin represented Makowsky in the sale of the Property.

Neither directly communicated with Makowsky in connection with the sale as all their

communications were directed to the Altmans.  Cumming Decl., ¶¶ 12-13;  Lavin Decl., ¶¶ 10-11.

Makowsky did not communicate with Cumming or Lavin or anyone else at Hilton & Hyland

regarding the sale of the Property other than Joshua Altman.  Makowsky Decl., ¶ 9; J. Altman

Decl., ¶ 14; M. Altman Decl., ¶ 7.

38.    Over the course of the year following the close of the sale, Makowsky spent

millions of dollars to do a complete restoration and renovation of the Property.  Makowsky Decl., ¶

14; *Compare* "before" photographs, Tuchman Decl., ¶ 19, Exh. P, Exh. 39 to the Kleidman Depo.

*with* "after" photographs, Exh. 40 to the Kleidman Depo., Adv. Dkt. 250-4 at 9-21, 22-30;

Declaration of Rayni Williams ("R. Williams Decl."), ¶ 9 and Exh. 2 [Photographs of Property at

2014 listing] thereto.

39.    Prior to his purchase of the Property, Makowsky did not discuss any of the

particulars relating to his development plans for the Property, such as the dollar amount to be

invested, the full extent of the renovations to be made, or when he expected it to be completed with

the Altmans, Cumming, Lavin, or anyone else at Hilton & Hyland.  Makowsky Decl., ¶ 11; J.

Altman Decl., ¶ 7; M. Altman Decl., ¶¶ 7, 10; Cumming Decl., ¶ 13; Lavin Decl., ¶ 11.

40.     Prior to his purchase of the Property, Makowsky did not have any discussions with the Altmans, Cumming, Lavin or anyone else at Hilton & Hyland, regarding which real estate agents and brokerage he intended to enlist to resell the Property once the renovations were done. Makowsky Decl., ¶¶ 11-12; J. Altman Decl., ¶ 7; M. Altman Decl., ¶¶ 7, 10; Cumming Decl., ¶ 13; Lavin Decl., ¶ 11.  Makowsky did not have any pre-existing agreement, arrangement or understanding that he would use Hilton & Hyland when he sold the Property and he did not even consider who he would use for his sale of the Property until his renovations were nearly completed in 2014.  Makowsky Decl., ¶ 12.  Hilton & Hyland, Cumming, Lavin and the Altmans had no hopes or expectations of representing Makowsky or his entities in other transactions based on his purchase of the Property from Kleidman.  J. Altman Decl., ¶ 16; M. Altman Decl., ¶ 9; Cumming Decl., ¶¶ 12-13; Lavin Decl., ¶¶ 10-11.

41.     Cumming and Lavin have never represented Makowsky, or his entities, in any real estate transaction.  Other than Makowsky's purchase of the Property from Kleidman, Matthew Altman has not represented Makowsky, or any of his entities, in any real estate transaction.  M. Altman Decl., ¶ 11; Cumming Decl., ¶ 12; Lavin Decl., ¶ 10.

42.     Many months after Makowsky's purchase of the Property from Kleidman, Joshua Altman learned of an off-market property in Bel Air available for purchase.  Joshua Altman shopped the opportunity to several potential buyers, including Makowsky, who was interested. Because Joshua Altman presented the opportunity to Makowsky, he hired Joshua Altman as his agent to buy the Bel Air property.  In July 2013, Makowsky acquired the Bel Air property.  The only real estate transactions in which Makowsky, or his entities, were represented by Joshua Altman were his purchase of the Property from Kleidman in January 2013 and his purchase of the Bel Air property in July 2013.  J. Altman Decl., ¶¶ 19-20; Makowsky Decl., ¶ 13.

43.     As Makowsky's renovations to the Property were nearing completion in 2014, he contacted Bacal at Rodeo Realty, Inc. (who had first shown the Property to Makowsky in November 2012) to list the Property for sale.  Makowsky told Bacal he wanted the Property co-listed with Branden Williams and Rayni Williams of Hilton & Hyland.  Makowsky had first met the Williams in mid-2013 regarding an unrelated real property being shown by the Williams.

1   Makowsky was impressed during the showing of that property by the Williams' professionalism

2   and aggressiveness.  On February 3, 2014, Makowsky, on behalf of his entity 9380 Sierra Mar,

3   LLC, entered into a Residential Listing Agreement with both Bacal, on behalf of Rodeo Realty,

4   Inc., and the Williams, on behalf of Hilton & Hyland, to co-list the Property for $25,000,000.

5   Hilton & Hyland's compensation under that agreement was to be 1.0% of the listing or purchase

6   price.  The Property was listed on the MLS and eventually sold for $19,000,000, which sale was

7   recorded on May 7, 2014.  Makowsky Decl., ¶¶ 14-16; Declaration of Branden Williams ("B.

8   Williams Decl."), ¶ 6-9 and Exh. 1 [February 3, 2014 residential listing agreement] thereto; R.

9   Williams Decl., ¶¶ 6-9.

10          44.      Neither the Altmans nor the Listing Agents represented or acted as agents in the

11   2014 resale of the Property. Nor did any of them receive compensation from that resale.

12   Makowsky Decl., ¶ 13; J. Altman Decl., ¶ 18; M. Altman Decl., ¶ 11; Cumming Decl., ¶ 14; Lavin

13   Decl., ¶ 11; B. Williams Decl., ¶ 8; R. Williams Decl., ¶ 8.

14          45.      Defendant Hilton & Hyland had a duty to disclose to Kleidman that it was the

15   broker representing both Kleidman and Makowsky on the sale of the Property.  Hilton & Hyland

16   made this disclosure to Kleidman and he consented to the dual agency.  Tuchman Decl., ¶ 14, Exh.

17   K, Adv. Dkt. 250-2 at 39; Tuchman Decl., ¶ 19, Exh. P, Adv. Dkt. 250-3 at 92.

18          46.      The custom and practice in the industry is that even in a dual agency, a real estate

19   agent or broker does not owe any duty to disclose to the seller whether it had represented the buyer

20   in prior real estate transaction or to investigate and disclose what other real estate transactions the

21   buyer was involved in or intended to be involved in.  Wallace Decl., ¶ 7(b).  Thus, Hilton & Hyland

22   did not owe a duty to disclose whether it had represented Makowsky or one of his entities in any

23   prior real estate transactions.  Nor did either Hilton & Hyland or the Altmans have a duty to

24   investigate and disclose what other real estate transactions Makowsky had been involved in or that

25   he intended to be involved in as a developer.

26          47.      When the sale of the Property from Kleidman to Makowsky closed, Kleidman was

27   satisfied with the work and efforts of his Listing Agents and Hilton & Hyland and, following the

28   close of escrow, sent them a thank you email praising their hard work and efforts.  Tuchman Decl.,

1  ¶ 19, Exh. P, Adv. Dkt. 250-3 at 73; Cumming Decl., ¶ 14 and Exh. C [February 2, 2013 email]

2  thereto; Lavin Decl., ¶ 12 and Exh. C [same] thereto.

3     48.    On or around July 1, 2016, Kleidman went online and saw that the Property

4  had sold in May 2014 for $19 million. Based thereon, he "inferred that Hilton & Hyland

5  helped Buyer get a below-market deal." Tuchman Decl., ¶ 10, Exh. G [Plaintiff's

6  Responses to Hilton & Hyland's Interrogatories, Set One], Adv. Dkt. 250-1 at 207.

7     49.    On July 22, 2016, this Court granted Kleidman's motion for entry of a final decree

8  and closed his bankruptcy case on July 28, 2016. Case Dkt. 285, 287.

9     50.    On August 1, 2016, Kleidman filed his complaint against Hilton & Hyland and the

10 Altmans alleging various breaches of fiduciary duty. Kleidman acknowledges that he would not

11 have sued the Defendants if he had not learned of the 2014 sale of the Property for $19 million.

12 Tuchman Decl., ¶ 19, Exh. P, Adv. Dkt. 250-3 at 144-45.

13    51.    To the extent required, should any of the foregoing findings of fact be deemed to be

14 conclusions of law, they are hereby adopted as such.

15                              **CONCLUSIONS OF LAW**

16    1.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).

17 Kleidman's claims for relief are non-core proceedings to which the parties have consented to the

18 entry of final judgment by this Court. Adv. Dkt. 155 at 5.

19    2.    Summary judgment should be granted when there are no genuine issues of material

20 fact and when, as a matter of law, the moving party is entitled to prevail. Fed. R. Civ. P. 56(a)

21 (made applicable in this adversary proceeding by Fed. R. Bankr. P. 7056). "Summary judgment

22 procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part

23 of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

24 determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) quoting Fed. R.

25 Civ. P. 1. "The purpose of summary judgment is to avoid unnecessary trials when there is no

26 dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

27 F.3d 1468, 1471 (9th Cir. 1994).

28

3.      As movants, the Defendants have "'both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.'" *Friedman v. Live Nation Merch., Inc*., 833 F.3d 1180, 1188 (9th Cir. 2016) quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  They also bear the initial burden of production as to each material fact upon which they have the burden of persuasion at trial.  *Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

4.      As to all matters on which Kleidman bears the ultimate burden of persuasion at trial, the Defendants "may discharge [their] initial burden by 'show[ing] that the nonmoving party does not have enough evidence of an essential element to carry [his] ultimate burden of persuasion at trial.'" *Id*. Alternatively, Defendants may satisfy their burden of production by producing "evidence negating an essential element of the nonmoving party's claim." *Nissan Fire & Marine*, 210 F.3d at 1102.

5.      The operative complaint is Kleidman's Third Amended Complaint as limited by this Court's *Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Third Amended Complaint* (the "Order").  Adv. Dkt. 88.  The only remaining causes of action are breach of fiduciary duty, and a negligence cause of action which Kleidman has parsed into two claims, one labeled as a breach of the duty of fairness claim and another labeled as a breach of the duty of care claim.  Additionally, for the reasons stated in the Order, to the extent Kleidman bases either his breach of fiduciary duty claim or his negligence claim on an alleged "duty to achieve as high a price as possible" in the sale of the Property, those claims were dismissed.  *Id*.

6.      California law governs both causes of action.  "A claim for breach of fiduciary duty requires the following elements be shown: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damages." *Slaieh v. Simon*s, 584 B.R. 28, 41 (C.D. Cal. 2018) (citing *Gutierrez v. Girardi*, 194 Cal. App. 4th 925, 932 (2011)).  The elements of a negligence claim are "(1) a legal duty to use due care; (2) a breach of that duty; (3) a reasonably close causal connection between that breach and the resulting injury; and (4) actual loss or damage." *Carleton v. Tortosa*, 14 Cal. App. 4th 745, 754 (1993).

7.      As a general rule, the plaintiff bears the burden of proof of all elements of his claims.  Cal. Evid. Code § 500 ("Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting").  However, in the context of a breach of fiduciary duty claim, once the principal establishes the existence of a fiduciary relationship and alleges a violation of the agent's fiduciary duties to him, the burden shifts to the agent to prove that he or she acted in good faith toward the principal and made full disclosure.  *Jorgensen v. Beach 'N' Bay Realty, Inc.*, 125 Cal. App. 3d 155, 162-63 (1981) (burden shifted to real estate agents once, in a dual agency, their seller client established a fiduciary relationship and alleged her agents failed to disclose material facts regarding an agreement between the agents and the buyer) citing *Timmsen v. Forest E. Olson, Inc.*, 6 Cal. App. 3d 860, 871 (1970).  Kleidman bears the ultimate burden of persuasion at trial on the first and third elements of his breach of fiduciary duty claim and all elements of his negligence claim.  Defendants bear the burden of persuasion that they acted with good faith toward Kleidman and with full disclosure.  Defendants' Motion also argues that Kleidman's claims for relief are barred by judicial estoppel.  As an affirmative defense, Defendants bear the burden of persuasion on judicial estoppel.

8.      Summary judgment is warranted:

> "[I]if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the

15

1    nonmoving party's case necessarily renders all other facts immaterial.

2    The moving party is "entitled to a judgment as a matter of law"

3    because the nonmoving party has failed to make a sufficient showing

4    on an essential element of her case with respect to which she has the

5    burden of proof.

6  *Celotex Corp.* 477 U.S. at 322-23.  Because the Motion asserts that Defendants are entitled to

7  judgment on both the breach of fiduciary duty claim and the negligence claim, Kleidman must

8  make a sufficient showing to establish the existence of every element of those claims on which he

9  has the burden of proof.  "A complete failure of proof concerning an essential element" of

10  Kleidman's claim "necessarily renders all other facts immaterial."  *Id.*

11      9.    Defendants' Motion does not merely argue that Kleidman cannot prove essential

12  elements of his claims on which he has the burden of proof.  Defendants also assert, and offer

13  voluminous supporting evidence, that they did not breach any of their fiduciary duties to Kleidman,

14  acted in good faith towards him and made full and complete disclosure to him of all requisite facts.

15  Although Kleidman does not bear the burden of proof on these issues at trial, to defeat summary

16  judgment he must produce sufficient evidence on the material issues to demonstrate that a genuine

17  issue of fact exists.

18      10.    Kleidman's evidence in opposition "must do more than simply show that there is

19  some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

20  *Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "The mere existence of a scintilla of evidence in

21  support of the plaintiff's position will be insufficient; there must be evidence on which the jury

22  could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

23  Legal arguments and assertions unsupported by evidence are insufficient to create a genuine issue

24  of fact.  *Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) ("Lane has not provided

25  evidence in her pleadings, depositions, answers to interrogatories, or affidavits to show willfulness

26  or damages . . . Lane's allegations in her complaint and her attorney's statements at oral argument

27  are insufficient to defeat a summary judgment motion."); *S. A. Empresa de Viacao Aerea Rio*

28  *Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982) ("[A]

1  party cannot manufacture a genuine issue of material fact merely by making assertions in its legal

2  memoranda."). Similarly, Kleidman's repeated assertations that the testimony of Cumming and the

3  Altmans is not credible does not satisfy his burden. *National Union Fire Ins. Co. v. Argonaut Ins.*

4  *Co.*, 701 F.2d 95, 97 (9th Cir.1983) ("Neither a desire to cross-examine an affiant nor an

5  unspecified hope of undermining his or her credibility suffices to avert summary judgment");

6  *Robinson v. Adams*, 847 F.2d 1315, 1316–17 (9th Cir. 1987) ("Robinson contends that he can

7  survive a motion for summary judgment because some evidence in the record suggests that Orange

8  County and the employees could have discovered he is Black. . . We do not believe that Robinson

9  has produced sufficient evidence on the question of the knowledge by Orange County or the

10  employees of his race for a jury to return a verdict in his favor.. . .  All of these screeners declared

11  that they were unaware of Robinson's race when they reviewed and rejected his applications.

12  Although the credibility of the application screeners could be a triable issue, Robinson has

13  produced no evidence that places their credibility in doubt. . . . In light of this record, we conclude

14  that there was no genuine dispute as to whether the application screeners were aware of Robinson's

15  race.").

16     11. To the extent Kleidman asserts that a fact is genuinely disputed, Rule 56 mandates

17  that he support his assertions by "citing to particular parts of materials in the record, including

18  depositions, documents, electronically stored information, affidavits or declarations, stipulations

19  . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  "A party

20  opposing summary judgment must direct [the court's] attention to specific, triable facts." *Southern*

21  *Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).  The Court is "not required to

22  comb the record to find some reason to deny a motion for summary judgment."  *Forsberg v. Pac.*

23  *Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988).

24     12. The Court's own local rules place additional procedural requirements on the parties,

25  requiring their citations to evidence regarding material facts to be presented in a specific format.

26  As movants, the Defendants are required to file and lodge a statement of uncontroverted facts

27  which "must identify each of the specific material facts relied upon in support of the motion and

28  cite the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission

17

1  or other document relied upon to establish each such fact." LBR 7056-1(b)(2)(B).  The

2  Defendants' Statement of Uncontroverted Facts identifies 71 material facts on which they rely and

3  identifies the evidence in support of each such fact.  Adv. Dkt. 249.  The local rules require

4  Kleidman to file and lodge a statement of genuine issues which "must identify each material fact

5  that is disputed and cite the particular portions of any pleading, affidavit, deposition, interrogatory

6  answer, admission or other document relied upon to establish the dispute and the existence of a

7  genuine issue . . . "  LBR 7056-1(c)(2)(B).   Kleidman filed his Statement of Genuine Issues which

8  responds to 26 of Defendants' 71 material facts; in each instance, Kleidman re-writes the

9  Defendants' material fact and re-states the same evidence cited by the Defendants in support of the

10 material fact.  Adv. Dkt. 350.  Kleidman offers citations to his own proffered evidence on only

11 eight of his 26 responses.  Adv. Dkt. 350, 12, 33, 34, 37, 38, 47, 48, 63.  Kleidman's Statement of

12 Genuine Issues fails to satisfy the requirements of either Rule 56(c) or LBR 7056-1(c).  Thus, he

13 has not identified any evidence which creates a genuine dispute about the vast majority of the

14 Defendants' material facts.

15     13.    In support of their Motion, the Defendants offer the declaration of their expert

16 witness, Allan Wallace, on the applicable standard of care for real estate agents and brokers in

17 California in the sale of real property, including the scope of a broker's fiduciary duties on certain

18 issues in the absence of either statutory or contractual defining the agent or broker's duties in

19 connection with those issues.  Adv. Dkt. 258.  Specifically, Wallace opines on whether Hilton &

20 Hyland had a duty to determine the value of the Property, whether the Defendants had a duty to

21 disclose prior transactions with Makowsky or to investigate what other real estate transactions

22 Makowsky intended to be involved in.  *Id*.  Wallace also opines on whether the Defendants'

23 conduct in this case falls below the standard of care for real estate agents or brokers in this

24 community.  *Id*.  Wallace's expert testimony is relevant to Kleidman's breach of fiduciary duty

25 claim as well as his negligence claim.

26     14.    The production of Wallace's expert testimony on these issues creates an additional

27 burden on Kleidman to avoid summary judgment.  Under California law, "[i]n negligence cases

28 arising from the rendering of professional services, as a general rule the standard of care against

18

1   which the professional's acts are measured remains a matter peculiarly within the knowledge of

2   experts. Only their testimony can prove it, unless the layperson's common knowledge includes the

3   conduct required by the particular circumstances. . . When a defendant moves for summary

4   judgment and supports his motion with expert declarations that his conduct fell within the

5   community standard of care, he is entitled to summary judgment unless the plaintiff comes forward

6   with conflicting expert evidence." *Webster v. Claremont Yoga*, 26 Cal. App. 5th 284, 288–89

7   (2018); *Acinelli v. Torres*, 2019 WL 6825767, *6 (C.D. Cal., Apr. 22, 2019).  This rule is equally

8   applicable in federal actions in which a defendant moves for summary judgment under Rule 56 on

9   a claim governed by California law:  "when the defendant supports his motion for summary

10  judgment with the declarations of experts, a plaintiff who has presented no expert evidence

11  concerning the required standard of care has failed to make a sufficient showing that there are

12  genuine factual issues for trial." *Hutchinson v. United States*, 838 F.2d 390, 393 (9th Cir. 1988).

13  Kleidman offers no expert evidence to rebut the issues addressed by the Wallace declaration and

14  therefore has not shown that there are any genuine issues for trial on those matters.

15  **Breach of Fiduciary Duty**

16      15.     "Real estate brokers are subject to two sets of duties: those imposed by regulatory

17  statutes, and those arising from the general law of agency." *Ryan v. Real Estate of the Pacific, Inc.*,

18  32 Cal. App. 5th 637, 646 (2019) (citing *Carleton v. Tortosa*, 14 Cal. App. 4th 745, 755 (1993);

19  *Padgett v. Phariss*, 54 Cal. App. 4th 1270, 1279 (1997)).

20  > A "broker's fiduciary duty to his client requires the highest good faith
21  > and undivided service and loyalty. (*Stiefel v. McKee* (1969) 1
    > Cal.App.3d 263, 266, 81 Cal.Rptr. 565; *Timmsen v. Forest E. Olson,*
22  > *Inc.* (1970) 6 Cal.App.3d 860, 871, 86 Cal.Rptr. 359; *Ford v.*
    > *Cournale* (1973) 36 Cal.App.3d 172, 180, 111 Cal.Rptr. 334.)
23  > 'The broker as a fiduciary has a duty to learn the material facts that
    > may affect the principal's decision. He is hired for his professional
24  > knowledge and skill; he is expected to perform the necessary research
    > and investigation in order to know those important matters that will
25  > affect the principal's decision, and he has a duty to counsel and
    > advise the principal regarding the propriety and ramifications of the
26  > decision. The agent's duty to disclose material information to the
    > principal includes the duty to disclose reasonably obtainable material
27  > information. [¶] ... [¶] The facts that a broker must learn, and the

28

> advice and counsel required of the broker, depend on the facts of
> each transaction, the knowledge and the experience of the principal,
> the questions asked by the principal, and the nature of the property
> and the terms of sale. The broker must place himself in the
> position of the principal and ask himself the type of information required for
> the principal to make a well-informed decision. This obligation
> requires investigation of facts not known to the agent and disclosure
> of all material facts that might reasonably be discovered.' (Miller &
> Starr, Real Estate Law 2d, Agency, § 3.17, pp. 94, 96–97, 99.)

*Field v. Century 21 Klowden-Forness Realty*, 63 Cal. App. 4th 18, 25–26 (1998).  See also *Wyatt v. Union Mortg. Co*., 24 Cal.3d 773, 782 (1979) ("A real estate licensee is 'charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision'").

16.    Because an agency relationship fundamentally is a contractual relationship, a principal and his agent may modify and define the existence and extent of the agent's fiduciary duties to his principal.  *Carleton*, 14 Cal. App. 4th at 755 (real estate agent did not owe principal duties which were expressly disclaimed in the listing agreement).  See also, Miller & Starr, 2 Cal. Real Est. § 3:34 (4th ed. 2018) ("The extent of the duties of the agent are determined by the terms of the agreement between the parties and the contract can define, modify, and limit the terms of the agency and the agent's fiduciary duties.  The terms of the contract between the principal and the agent may limit the scope of the agency and restrict the scope of the agent's fiduciary duties").

17.    Hilton & Hyland did not have a duty to determine the value of the Property.  The RLA entered into by Kleidman and Hilton & Hyland did not require Hilton & Hyland to determine the value of the Property, to opine on the value of the Property or to determine the listing price for the Property.  The RLA, at paragraph 8, expressly provides that Kleidman is responsible for determining the price to list the Property and to sell the Property.  Case Dkt. 99 at 25.   The custom and practice in the industry is that the seller determines the price and that neither the agents nor the broker owe a duty to provide an opinion regarding value or to determine the value of the property.  Wallace Decl., ¶ 7(a).  Kleidman's Listing Agents, Cumming and Lavin, were not in possession of any facts which created a "independent duty to ascertain the true fair market value of the property."

*Padgett*, 54 Cal. App. 4th at 1285.  Kleidman failed to present any evidence creating a genuine dispute that Hilton & Hyland did not have a duty to determine the value of the Property.

18.    Kleidman did not rely on Hilton & Hyland to opine on the value of the Property as he had hired a professional real estate appraiser to value the Property in 2010 (who valued the Property at $4.2 million), had listed the Property in 2012 with a different broker for $3.9 million and had valued the Property at $3.8 million in his Schedule A and $4.0 million in an amended Schedule A.

19.    Hilton & Hyland did not have a duty to determine what the value of the Property might be following millions of dollars of renovations, particularly in the absence of any evidence from Kleidman that he told Hilton & Hyland at the time of the RLA that he had the means to invest millions of dollars for such renovations.  Kleidman failed to present any evidence creating a genuine dispute that Makowsky invested millions of dollars to renovate the Property.  Kleidman failed to present any evidence creating a genuine dispute that Hilton & Hyland did not have a duty to determine what the value of the Property might be following millions of dollars of renovations.

20.    The $7.05 million appraisal of the Property as of January 23, 2013 offered by Kleidman in opposition to the Motion does not change or expand the scope of duty owed by Hilton & Hyland to Kleidman regarding the value of the Property.

21.    Hilton & Hyland had a duty to disclose to Kleidman that it represented both Kleidman and Makowsky and that the sale of the Property to Makowsky was a dual agency situation.  Hilton & Hyland fully disclosed this fact to Kleidman, and he understood that Makowsky's agents, the Altmans, were licensed with Hilton & Hyland.  Hilton & Hyland did not breach its duty to disclose the dual agency to Kleidman.  Kleidman failed to present any evidence creating a genuine dispute that Hilton & Hyland fully disclosed the dual agency to him and that he consented to the dual agency.

22.    Neither Hilton & Hyland, nor the Altmans, had a duty to disclose to Kleidman whether they had previously represented Makowsky in any prior real estate transactions.  Neither Kleidman's Listing Agents, Cumming and Lavin, nor the Altmans, had previously represented Makowsky in a real estate transaction prior to the sale of the Property from Kleidman to

1    Makowsky.  Kleidman failed to present any evidence creating a genuine dispute that Cumming,

2    Lavin and the Altmans never previously represented Makowsky in any prior real estate

3    transactions.

4         23.     Neither Hilton & Hyland, nor the Altmans, had a duty to disclose to Kleidman what

5    future real estate transactions Makowsky might be involved in.

6         24.     There was no agreement – formal or informal -- between Makowsky and any of the

7    Defendants that they would represent him on a future sale of the Property or other future real estate

8    transactions involving Makowsky.  Kleidman failed to present any evidence creating a genuine

9    dispute that any such agreement or understanding existed.  Neither Kleidman's Listing Agents,

10   Cumming and Lavin, nor the Altmans, represented Makowsky in the 2014 sale of the Property.

11   Makowsky did not decide to co-list the Property for sale with both Rodeo Realty, Inc. and Hilton &

12   Hyland until 2014.

13        25.     The Defendants have established that they did not breach any fiduciary duty to

14   Kleidman.

15   **Negligence**

16        26.     Kleidman's negligence claims require a breach of the duty of care owed to

17   Kleidman by the Defendants.  For the foregoing reasons, Defendants did not breach any fiduciary

18   duties to Kleidman.

19        27.     The Defendants did not breach any other duties to Kleidman and their conduct in

20   connection with the sale of the Property did not fall below the standard of care for real estate agents

21   and brokers, even in a dual agency.

22        28.     Kleidman has failed to present any evidence that the Defendants breached any duty

23   of care owed to Kleidman.

24   **Causation / Damages**

25        29.     Kleidman's theory of damages is that, at the time of the sale, the Property was worth

26   $7.05 million but only sold to Makowsky for $5.3 million and that he is entitled to recover the

27   difference as lost profit.  Under California law, to be recoverable, damages must be ascertainable

28   within a reasonable degree of certainty.  "'Damages which are speculative, remote, imaginary,

1  contingent, or merely possible cannot serve as a legal basis for recovery.'" *Food Safety Net*

2  *Services v. Eco Safe Systems USA, Inc*., 209 Cal. App. 4th 1118, 1132 (2012) quoting *Frustuck v.*

3  *City of Fairfax*, 212 Cal. App. 2d 345, 367-68 (1963). "Lost profit damages must not be

4  speculative" and "must be proven to be certain both as to their occurrence and their extent."

5  *Sargon Enter., Inc. v. University of S. Cal.*, 55 Cal. 4th 747, 769, 773-774 (2012). The declaration

6  of Daniel Rinsch preliminary opinion (which is not based on an inspection of the Property's

7  interior or exterior prior to Makowsky's renovations) that the Property was worth $7.05 million

8  may be relevant to the extent of his alleged damages. The Rinsch declaration, however, does not

9  provide any evidence that Defendants caused the Property to not sell for that amount. Indeed,

10  Kleidman fails to present any evidence that, but for the conduct of Defendants, he would have sold

11  the Property for $7.05 million. Kleidman fails to present any evidence that Hilton & Hyland failed

12  to properly market the Property or to rebut its evidence that it thoroughly marketed the Property.

13  Kleidman fails to present any evidence to rebut Defendants' evidence showing that Makowsky's

14  initial $5.0 million offer for the Property in 2012 was the same amount he previously offered for

15  the Property when Kleidman was represented by a broker other than Hilton & Hyland. Kleidman's

16  unsupported assertions that Defendants could have, or should have, located a buyer willing to pay

17  $7.05 million are not evidence and are not sufficient to meet his burden to demonstrate the

18  certainty that he actually incurred any damages.

19  **Judicial Estoppel**

20      30.    "Judicial estoppel is an equitable doctrine that precludes a party from gaining an

21  advantage by asserting one position, and then later seeking an advantage by taking a clearly

22  inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).

23  It is a "discretionary doctrine, applied on a case-by-case basis." *Ah Quin v. County of Kauai Dep't*

24  *of Transp.*, 733 F.3d 267, 272 (9th Cir. 2013). Courts consider the following factors when

25  analyzing the applicability of judicial estoppel: "(1) whether a party's later position is 'clearly

26  inconsistent' with its original position; (2) whether the party has successfully persuaded the court of

27  the earlier position [;] and (3) whether allowing the inconsistent position would allow the party to

28  'derive an unfair advantage or impose an unfair detriment on the opposing party.'" *United States v.*

1    *Ibrahim*, 522 F.3d 1003, 1009 (9th Cir. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742,

2    750–51 (2001)).

3        31.    Kleidman's current assertion that the Property was worth $7.05 million and that

4    Hilton & Hyland failed to market the Property in a manner to achieve a sales price of $7.05 million

5    are clearly inconsistent with his prior testimony under penalty of perjury in connection with the

6    sale of the Property.  Kleidman's declaration in support of his sale motion stated that Makowsky's

7    $5.3 million offer was over the market value, fair and reasonable, and was the highest price

8    exceeding the next highest offer by at least $700,000.  Case Dkt. 100 at 13-14.  Kleidman's

9    declaration also stated that Hilton & Hyland's marketing plan was comprehensive, resulting in 18

10   showings and three received offers.  Kleidman's declaration was not, as he argues, based on

11   mistake or inadvertence, but upon his history of previously trying to sell the Property for a $3.9

12   million list price, his 2010 appraisal of the Property for $4.2 million and his valuation of the

13   Property on the petition date at $3.8 million.

14       32.    Kleidman successfully persuaded the Court of these facts, causing the Court to

15   approve the sale to Makowsky as a good faith purchaser within the meaning of 11 U.S.C. § 363(m),

16   the payment of broker's commissions to Hilton & Hyland, and the realization of net sales proceeds

17   for the bankruptcy estate.  Case Dkt. 117.

18       33.    Kleidman benefitted from the sale of the Property and his estate received the net

19   sales proceeds which he used, in part, to confirm his chapter 11 plan and receive a discharge.

20   Allowing him to profit by now declaring that his previous testimony under penalty of perjury was

21   neither true nor accurate would be manifestly unfair.  This is especially true in light of Kleidman's

22   failure to produce any evidence demonstrating that but for Hilton & Hyland's conduct, Kleidman

23   would have located his hypothetical buyer willing to purchase the Property for $7.05 million.

24       34.    A debtor-in-possession's testimony in support of a successful sale motion does not

25   per se preclude the debtor from later asserting that his broker breached its fiduciary duty to the

26   debtor and the estate.  On these facts, however, given Kleidman's previous attempts to sell the

27   Property and prior appraisal of the Property and Kleidman's inability to produce evidence of any

28

1  misconduct by Defendants, judicial estoppel bars Kleidman from asserting contrary positions as to

2  marketing of the Property or the fairness of the purchase price paid by Makowsky.

3  **Rule 56(d)**

4      35.    Rule 56(d) gives the Court discretion to allow Kleidman to take additional discovery

5  to oppose the Motion.  "The purpose of Rule 56(d) relief is to prevent the nonmoving party from

6  being 'railroaded' by a summary judgment motion that is filed too soon after the start of a lawsuit

7  for the nonmovant to properly oppose it without additional discovery."  *Hollyway Cleaners &*

8  *Laundry Co., Inc. v. Cent. Nat'l Ins. Co. of Omaha, Inc.,* 219 F. Supp. 3d 996, 1003 (C.D. Cal.

9  2016).  In *Celotex Corp.*, the motion for summary judgment was filed one year after the action was

10  commenced and the Supreme Court stated that "no serious claim can be made that respondent was

11  in any sense 'railroaded' by a premature motion for summary judgment."  *Celotex Corp.*, 477 U.S.

12  at 326.  Here, the Defendants filed their Motion more than *two years* after Kleidman commenced

13  this action; the Motion is not "premature."  Additionally, Kleidman has had ample time to conduct

14  discovery.  The Court has heard at least fourteen discovery motions filed by Kleidman.  Based on

15  discovery requests that are the subject of those motions, Kleidman has propounded at least two sets

16  of interrogatories on the Altmans, two sets of requests for production of documents on the Altmans

17  and seven sets of requests for production for documents on Hilton & Hyland.  Case Dkt. 26, 110,

18  112, 110, 126, 150, 185, 190, 193, 194, 212, 214, 238, 242.  Exhibit T to the Defendants' Reply in

19  support of the Motion indicates Kleidman has propounded at least nine sets of interrogatories on

20  Hilton & Hyland.  Case Dkt. 354.

21      36.    A Rule 56(d) request requires specificity:  "A party requesting a continuance

22  pursuant to Rule [56(d)] must identify by affidavit the specific facts that further discovery would

23  reveal, and explain why those facts would preclude summary judgment . . . Tatum's request for a

24  continuance did not identify the specific facts that further discovery would have revealed or explain

25  why those facts would have precluded summary judgment. . . Absent a showing by Tatum that

26  additional discovery would have revealed specific facts precluding summary judgment, the district

27  court did not abuse its discretion by denying Tatum's request for a continuance."  *Tatum v. City and*

28

1    *Cty. of San Francisco*, 441 F.3d 1090, 1100-01 (9th Cir. 2006).  Kleidman's declaration in support

2    of his Opposition fails to address any of these issues.

3         37.    In argument, Kleidman states that he wants to conduct discovery on whether

4    Defendants really had no opinions as to the value of the Property.  Adv. Dkt. 345 at 40.  Such facts,

5    however, are immaterial.  Kleidman failed to offer any expert testimony to rebut Wallace's

6    testimony that Defendants had no duty to provide an opinion as to value, even if they held such an

7    opinion.  Wallace, ¶ 7(a).  See also *Padgett*, 54 Cal. App. 4th at 1285 (real estate agent had no

8    "independent duty to ascertain the true fair market value of the property").  Kleidman also states

9    that he wants to depose Cumming because he alleges Hilton & Hyland failed to designate

10    Cumming in response to a Rule 30(b)(6) request.  Adv. Dkt. 345 at 40.  Kleidman's argument is

11    without merit.  Cumming was Kleidman's own listing agent on the sale of the Property.  Cumming

12    signed the RLA.  Cumming was known to Kleidman since 2012, before the Property was sold.

13    Kleidman has had ample opportunity to depose his own listing agent but apparently chose not to do

14    so.

15         38.    Kleidman's request to conduct further discovery is denied.

16         39.    The Defendants are entitled to summary judgment as a matter of law on all of the

17    remaining causes of action.

18         40.    To the extent required, should any of the foregoing conclusions of law be deemed to

19    be findings of fact, they are hereby adopted as such.

20    **IT IS SO ORDERED.**

21                   # # #

22

23    Date: August 20, 2020

24                   Martin R Barash
               United States Bankruptcy Judge

25

26

27

28